CITY OF DAYTONA BEACH v. E. L. KING.

181 So. 1.
Opinion Filed March 11, 1938.
Rehearing Denied May 17, 1938.

274

*Leon J. C. Harton* and *Mary Jo. Garris,* for Plaintiff in Error;

*Erskine W. Landis* and *Hull, Landis & Whitehair,* for Defendant in Error.

CHAPMAN, J.—This cause is before the Court on writ of error to a final judgment for the sum of $10,124.80 entered by the Circuit Court of Volusia County, Florida, on November 23, 1936, in behalf of E. L. King against the City of Daytona Beach, a municipal corporation in Volusia County, Florida. The basis of the judgment is a contract entered into between the parties dated December 15, 1927, in which it recites that King was the owner of the Clarendon Golf Course at Daytona Beach and contemplated the erection of a clubhouse, and improvements of the golf course, so citizens and visitors of said City for a reasonable fee would be admitted and the city would be materially benefited. It was agreed that if King would build or construct the clubhouse, improve the golf course and admit citizens and visitors of the city to the public golf course for a reasonable fee, the City would pay to Mr. King each year for ten years a sum of money equal to the total sum

of the state, county and municipal taxes assessed against such property (the Clarendon Golf Course owned by E. L. King) for such year. The contract was observed by the parties for several years, and the suit at bar involves the taxes on the property only for the years 1932, 1933 and 1934.

A demurrer of the plaintiff was by the lower court sustained as to pleas 5, 6, 7, 8 and 9, and the defendants declining to plead further, a judgment was entered for the plaintiff and the ruling of the lower court on the demurrer presents squarely the questions to be determined by this Court. The fifth plea alleges the contract was *ultra vires* and void and that the 1931 Legislature, by Chapter 15157, Special Acts, was without authority to ratify and confirm said contract. Plea six alleged that Chapter 15157, Special Acts of 1931, which attempted to validate the *ultra vires* and void contract was unconstitutional and void because it did not deal with any municipal purpose. Pleas seven, eight and nine tender practically the same legal questions. The attorneys of record for the respective parties admit on the record that no questions *in pais* are presented, but solely questions of law.

Broadly speaking, the question for decision here is: "Is the contract sued upon in this case and partially executed by the respective parties *ultra vires* or valid and binding and within the power of the city to enter into, and the legal effect of Chapter 15157, Special Acts of 1931, upon the said contract?" If the contract was within the power of the City of Daytona Beach to make and enter into, then the judgment here for review should be affirmed. Likewise if the contract before us was *ultra vires* when entered into in 1927 and the legal effect of Chapter 15157, Special Acts of 1931, was to ratify, confirm, validate and legalize the contract, assuming Chapter 15157, *supra,* is constitutional,

then the judgment appealed from should be affirmed. If the contract was not within the power of the City of Daytona Beach to enter into under its charter provisions or otherwise, and Chapter 15157, *supra*, is void and unconstitutional, then the judgment appealed from should be reversed. It is clearly shown in the record in this cause that the suit at bar is based on the 1927 contract and for the amount due thereunder for an amount equalling the taxes for the years 1932, 1933, and 1934.

It is well settled that municipalities are created (or established) and abolished by the Legislature. Section 8 of Article VIII of the Constitution of Florida gives the Legislature power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers and to alter and amend charters of municipalities at any time. See State v. Burr, 79 Fla. 290, 84 So. 61; State v. City of Miami, 103 Fla. 54, 137 So. 261; Coen v. Lee, 116 Fla. 215, 156 So. 747. We have examined Chapter 10466, Special Acts of 1925, and subsequent amendatory Acts being the charter provision of the City of Daytona Beach for the power and authority to enter into the contract now before us. It is suggested in brief of counsel for defendant in error that a golf course was indispensable to the winter visitors and citizens of Daytona Beach, and it is immaterial whether it is operated by the city or a private enterprise, rented by a city or hired by a city, owned by a city or owned by individuals. The ends to be achieved by the contract was a public golf course accessible to all visitors and citizens of Daytona Beach for a reasonable charge and the contract obtained these objectives. This Court, in the case of City of Bradenton v. State, 88 Fla. 381, 102 So. 556, which was a suit to validate bonds issued by the municipality, the proceeds of which were to be used for the enlargement and maintenance of

a golf course within the City of Bradenton, held that the city may have had the power to purchase and maintain a golf course, owned by the city, maintained by the city and operated impartially in the interest of the local public by the city. The court, speaking through Mr. Justice WHIT-FIELD, said:

"The Constitution contains the following:

" 'The Legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time. When any municipality shall be abolished, provision shall be made for the protection of its creditors.' Sec. 8, Art. VIII.

" 'The Legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes, and all property shall be taxed upon the principles established for State taxation.' Sec. 5, Art. IX.

" 'No tax shall be levied for the benefit of any chartered company of the State, nor for paying interest on any bonds issued by such chartered companies, or by counties or by corporations, for the above mentioned purpose.' Sec. 7, Art. IX.

" 'No person shall be deprived of life, liberty or property without due process of law.' Sec. 12, Declaration of Rights, Florida Constitution.

"Section 8, Article VIII, gives to the Legislature broad authority 'to prescribe the jurisdiction and powers' of municipalities, but by necessary intendment the organic provision contemplates that the powers to be conferred upon municipalities shall conform to and not be in conflict with or violate any applicable provisions and principles of organic law. Brown v. Lakeland, 61 Fla. 508.

"While the Courts will give due weight to a legislative determination of what is a municipal purpose, yet where the purpose declared by statute to be such, may in fact be not a municipal purpose, or where the purpose may be by the Constitution expressly or by implication excluded as a municipal purpose, or where the execution of the purpose may involve a violation of organic law, the courts will ultimately determine whether it is or is not a permissible municipal purpose, and in doing so will consider the pertinent facts that may be peculiar to the particular case as well as the controlling law in the premises. And while the Legislature may, within reasonable limitations, authorize a municipality to determine what is a municipal purpose, in order that peculiar facts affecting the particular matter may have due appreciation, yet the discretion or judgment of the municipality in the premises must accord with controlling provisions and principles of law, and acts done are subject to judicial review so that the law and not arbitrary or unreasonable municipal action shall control, to the end that private rights may be conserved as is required by law. * * *

"In view of the rule that the authority of municipalities to act and particularly to levy a tax must be made to clearly appear, and that doubts, if any, as to the power sought to be exercised must be resolved against the municipality, it is not evident that the power here sought to be exercised is contained within the stated powers conferred or within other general grants of power for municipal governmental purposes, the issuing of bonds to construct a golf course being more in the nature of a corporate than of a governmental function. The powers of municipal governments must be exercised to conserve the interests of inhabitants and taxpayers, and tax levies are legal only in so far as they are clearly authorized by law for proper public purposes.

"To further a commendable policy in conserving the general welfare, of encouraging the development and use of the pleasure and health-giving attributes of the State that make Florida a blessing to residents and peculiarly attractive to those who live elsewhere, the Legislature might authorize municipalities, within appropriate limitations for the protection of taxpayers, to purchase and maintain golf courses to be impartially conducted in the interest of the local public, thereby declaring it to be a municipal purpose; but the judiciary should not be astute in deducing implications of such authority from general powers conferred upon municipalities, in order to pioneer in anticipation of express legislation.

"By answer a taxpayer avers facts tending to show that the proposed bond issue and the resultant tax levy by the municipality are for the benefit of a private golf club which is a chartered company of the State, in violation of Section 7, Article X, of the Constitution.

"In this proceeding brought under statutory authority (Sections 3296-3302, Revised General Statutes) the Court is expressly authorized 'to determine' the authority of the city to incur the bonded debt as well as 'the legality of all proceedings had or taken in connection therewith.' The Circuit Judge had the power herein to determine whether the issuing of the bonds would involve a tax levy for the primary or direct benefit of a chartered company of the State, in violation of the Constitution, and his adjudication refusing to validate the bonds cannot be said on this record to be an abuse of judicial discretion or power."

The contract here shows that Mr. E. L. King is the owner of the golf course; that Mr. E. L. King is to build or construct (on Mr. King's golf course) a clubhouse; he is to improve the course owned by him in some manner not clearly shown; and he is to operate the (Mr. King's) prop-

erty in Daytona Beach by charging reasonable admission fees to his golf course to the visitors and citizens of the City. The facts are clearly distinguishable from the Bradenton case, *supra,* in that the Clarendon Golf Course is owned by Mr. King, operated by Mr. King, maintained by Mr. King, controlled by him and he is the recipient of all the accrued benefits. He is in complete and full dominion of the Clarendon Golf Course. The sum of $10,124.80 of the taxpayers' money of the city passes to the support and maintenance of a private enterprise if the judgment in this case is affirmed. There exists a grave doubt as to the constitutional authority of the City to assess and collect money from the property owners of said City and expend it for a private rather than a public or municipal purpose. Money raised by taxation can be expended only as authorized by law. The rule enunciated by this Court in the case of Peterson v. Town of Davenport, 90 Fla. 71, 105 So. 265, is in harmony and does not conflict with the law stated in City of Bradenton v. State, *supra.*

We are in accord with the views of counsel for defendant in error that it is more economical on the part of the City of Daytona Beach to obtain the benefits of a golf course through this contract method than for the same to be owned and operated by the City, but many governmental units operate, frequently with heavy financial losses. If the taxpayers' money can be diverted and used to finance a private golf course, why not take a further step and finance a private billiard parlor, a private dance hall, a private baseball team, a private "jook," or set up a private drug store or private automobile business. The purpose of taxation on the part of government is to provide funds or money with which to promote the general welfare and protection of its citizens. The power to tax is an inherent right or attribute of sovereignty. This power wisely administered can

promote the general welfare and happiness of a people or a nation, and impliedly carried the authority to wreck or destroy. It is generally conceded that a people are best governed which is least governed, and this axiom applies to taxation. It is necessary to keep all taxation within constitutional and statutory limitations to promote the general welfare and happiness of our people. The bonds in Peterson v. Town of Davenport, 90 Fla. 71, 105 So. 265, were approved by a vote of the freeholders of said town and subsequently validated, legalized and confirmed by a Special Act of the Legislature.

The power of a municipality to make binding contracts and expend municipal funds has been before this Court in a number of cases. See: Town of Madison v. Newsome, 39 Fla. 149, 22 So. 270; Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203; Liberis v. Harper, 89 Fla. 477, 104 So. 853; Cawthon v. Town of DeFuniak Springs, 88 Fla. 324, 102 So. 250; Hardee v. Brown, 56 Fla. 377, 47 So. 834; State, ex rel. Worley, v. Lewis, 55 Fla. 580, 46 So. 630; Porter v. Vinzant, 49 Fla. 213, 38 So. 607, 111 Am. St. Rep. 83; Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716, and other authorities.

Having determined that the contract, *supra,* provides for the payment of municipal funds for a private purpose, can Chapter 15157, *supra,* in a retroactive sense, ratify, confirm, validate and legalize the said agreement? We observe in full the conclusions reached in City of Bradenton v. State and Peterson v. Town of Davenport, *supra.* Section 7 of Article IX provides:

"No tax shall be levied for the benefit of any chartered company of the State, nor for paying interest on any bonds issued by such chartered companies, or by counties, or by corporations, for the above mentioned purpose."

In Stockton v. Powell, 29 Fla. 1, text 31-32, 10 So. 688, this Court said:

"\* \* \*; but with us it is assumed that this form of promoting the construction of highways has been inhibited by a constitutional provision, ordaining that, 'no tax shall be levied for the benefit of any chartered company of the State, nor for the paying interest on any bonds issued by such chartered companies, or by counties, or by corporations, for the above mentioned purpose;' Section 7, Article IX. There is, however, no feature here of aid, even in form, to any incorporated or other company, nor does the statute propose any benefit to any private purpose, or private enterprise. The work is to be carried on under the direction and control of the public agencies named in the Act, and no individual, natural or artificial, nor any company, incorporated or unincorporated, is the special object of the benefaction of the improvement contemplated, but it, on, the contrary, is for the public without discrimination \* \* \*"

Likewise, in Hunter v. Owens, 80 Fla. 812, text 828-9, 86 So. 839, this Court had before it Section 7 of Article IX, *supra,* and said:

"\* \* \* In testing the validity of a statute with reference to the facts and circumstances upon which it is to operate, the validity of the statute does not depend upon the preponderance of evidentiary considerations; but the statute stands unless it conclusively appears that there can be no conceivable circumstances upon which it can validly operate or that under no circumstances can it operate or be effective to accomplish the intended purpose, without violating organic rights. The propriety of action taken under the statute is subject to judicial review. While under the Constitution 'no tax shall be levied for the benefit of any chartered company of this State,' (Section 7, Art. IX), yet if a

public improvement that is afforded by tax levies does merely incidentally benefit private corporations along with other persons, the Constitution is not violated in levying the tax for the public purpose, for the law contemplates that corporations shall participate in the burdens and benefits of taxations within appropriate limitations.

"It is within the power of the Legislature to establish a district of the character here considered as a governmental agency to effect the lawful public purpose of conserving the public health, comfort, convenience and welfare of the district and its inhabitants, and to impose an ad valorem tax therefor."

The law limits the purpose for which taxes may be assessed and collected and when the purpose is not authorized by law the same is void as expressed in Volume 1 (4th Ed.) of Cooly on Taxation, page 212, par. 87, viz.:

"Public Purpose of Tax.—It is the first requisite of lawful taxation, that the purpose for which it is laid shall be a public purpose. The decision to lay a tax for a given purpose involves a legislative conclusion that the purpose is one for which a tax may be laid; in other words, is a public purpose. But the determination of the Legislature on this question is not, like its decision on ordinary questions of public policy, conclusive either on the other departments of the government, or on the people. The question, what is and what is not a public purpose, is one of law; and though unquestionably the Legislature has large discretion in selecting the object for which taxes shall be laid, its decision is not final. In any case in which the Legislature shall have clearly exceeded its authority in this regard, and levied a tax for a purpose not public, it is competent for any one who in person or property is affected by the tax, to appeal to the courts for protection. This subject is considered in another chapter."

Likewise at page 381-2, par. 174:

"Statement of Rule.—It is implied in all definitions of taxation that taxes can be levied for public purposes only; and the rule that taxes can be levied only for public purposes is so well settled that a lengthy citation of decisions so holding is unnecessary. This is said to be 'an underlying principle of our government.' Differences of opinion frequently arise concerning the power to impose taxation in particular cases, but all writers who treat the subject theoretically and all jurists agree in the fundamental requirement that the purpose shall be public, and they differ, when they differ at all, upon the question whether the particular purpose proposed is within the requirement, i. e., is a public purpose. In some states the Constitution itself expressly provides that taxes shall be for public purpose only, and the word 'tax' as used therein has been held to include every character and kind of tax, general or special; but such a provision merely reiterates the general rule independent of the written law and adds no force to it. Likewise, taxation for other than public purposes is a taking of property without due process of law, within the meaning of the Fourteenth Amendment; and is also prohibited, it is said, by the provision of the Federal Constitution guaranteeing to every state a republican form of government."

In Green v. Frazier, 253 U. S. 233, text pages 238-40, 40 Sup. Ct. Rep. 499, 64 L. Ed. 878, the Supreme Court of the United States said:

"The due process of law clause contains no specific limitation upon the right of taxation in the States, but it has come to be settled that the authority of the States to tax does not include the right to impose taxes for merely private purposes. *Fallbrook Irrigation District v. Bradley,* 164 U. S. 112, 155. In that case the province of this Court in reviewing the power of state taxation was thoroughly

discussed by the late Mr. Justice Peckham speaking for the court. Concluding the discussion of that subject (p. 158) the Justice said: 'In the Fourteenth Amendment the provision regarding the taking of private property is omitted, and the prohibition against the State is confined to its depriving any person of life, liberty or property, without due process of law. It is claimed, however, that the citizen is deprived of his property without due process of law, if it be taken by or under state authority for any other than a public use, either under the guise of taxation or by the assumption of the right of eminent domain. In that way the question whether private property has been taken for any other than a public use becomes material in this court, even where the taking is under the authority of the State instead of the Federal government.' * * *

"In the present instance under the authority of the Constitution and laws prevailing in North Dakota the people, the Legislature, and the highest court of the State have declared the purpose for which these several Acts were passed to be of a public nature, and within the taxing authority of the State. With this united action of people, Legislature and court, we are not at liberty to interfere unless it is clear beyond reasonable controversy that rights secured by the Federal Constitution have been violated. What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances, Gray, Limitations of Taxing Power, par. 176, 'Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend

to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people' * * *"

Cooley's Constitutional Limitations, Volume 1 (8th Ed.) page 459-61, viz.:

"* * * The common council of the City of Buffalo undertook to provide an entertainment and ball for its citizens and certain expected guests on the 4th of July, and for that purpose entered into contract with a hotel-keeper to provide the entertainment at his house, at the expense of the city. The entertainment was furnished and in part paid for, and suit was brought to recover the balance due. The city had authority under its charter to raise and expend moneys for various specified purposes, and also 'to defray the contingent and other expenses of the city.' But providing an entertainment for its citizens is no part of municipal self-government, and it has never been considered, where the common law prevailed, that the power to do so pertained to the government in any of its departments. The contract was therefore held void, as not within the province of the city government.

"The supervisors of the City of New York refused to perform a duty imposed upon them by law, and were prosecuted severally and judgment recovered for the penalty which the law imposed for such refusal. The board of supervisors then assumed, on behalf of the city and county, the payment of these judgments, together with the costs of defending suits, and caused drafts to be drawn upon the treasurer of the city for these amounts. It was held that these drafts upon the public treasury to indemnify officers for disregard of duty were altogether unwarranted and void, and that it made no difference that the officers had acted conscientiously in refusing to perform their duty, and in

the honest belief that the law imposing the duty was unconstitutional * * *. It was in fact appropriating the public money for private purposes, and a tax levied therefor must consequently be invalid, on general principles controlling the right of taxation, which will be considered in another place * * * In an Iowa case it is said: 'No instance occurs to us in which it would be competent for (a municipal corporation) to loan its credit to or make its accommodation paper for the benefit of citizens, to enable them to execute private enterprises; 'and where it cannot loan its credit to private undertakings, it is equally without power to appropriate the moneys in its treasury for such purposes, or by the conduct of its officers to subject itself to implied obligations * * *"

In the case of Gray, as Sec'y of State, v. Central Fla. Lbr. Co., 104 Fla. 446, text p. 451-2, 140 So. 320, 141 So. 604, this Court adopted certain rules or canons to be observed in the construction of statutes, viz.:

"One challenging the constitutional validity of an Act of the Legislature is confronted with these canons of statutory construction: (1) On its face every Act of the Legislature is presumed to be constitutional; (2) Every doubt as to its constitutionality must be resolved in its favor; (3) If the Act admits of two interpretations, one of which would lead to its constitutionality and the other to its unconstitutionality, the former rather than the latter must be adopted; (4) The constitutionality of a statute should be determined by its practical operation and effect; (5) In determining its constitutional validity, courts should be guided by a substance and manner of operation rather than the form in which the Act is cast; and (6) After indulging all presumptions in favor of the Act, if it is found to be in positive conflict with some provision of organic law, it becomes the duty of the court to strike it down."

In State, *ex rel.* Moodie, v. Bryan, 50 Fla. 293, 39 So. 929, this Court said:

" 'Our State Constitution is a limitation upon power, and unless legislation duly passed be clearly contrary to some express or implied prohibition contained in the Constitution, the courts have no authority to pronounce it invalid. * * *

" 'The reasonableness or justice of a deliberate Act of the Legislature, the wisdom or folly thereof, the policy or motives prompting it, so long as the Act does not contravene some portion of the organic law, are all matters for legislative consideration and are not subject to judicial control. The courts are bound to uphold a statute, unless it is clearly made to appear beyond a reasonable doubt that it is unconstitutional.' "

See Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716; Pounds v. Darling, 75 Fla. 125, 77 So. 666, L. R. A. 1918E 949; City of Bradenton v. State, 88 Fla. 381, 102 So. 556; 19 R. C. L. 708 and 710.

Having concluded that the contract sued upon was *ultra vires* and it not being within the power of the City of Daytona Beach to collect taxes from the taxpayers of said city and disburse or pay out the same in support of a golf club owned, operated, and maintained by a private enterprise, and having concluded further that Chapter 15157, Special Acts of 1931, was insufficient in law to confirm, ratify, validate or legalize the said *ultra vires* Act, *supra,* it follows that the judgment appealed from be and the same is hereby reversed.

ELLIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.

BROWN, J., dissents.

BROWN, J. (dissenting).—It is not denied that the contract was a benefit to the City. The contract required King

to maintain and operate the golf course as a "public" course, and to charge only reasonable fees to the members of the public who desired to use the course, and the Legislature validated the contract.